Good morning. I would like to reserve 15 minutes for rebuttal. Lanny Smith is an innocent man who's been wrongfully incarcerated for 19 years. My name is Elisa Massa and I represent Lanny Smith. The district court's denial to release biological evidence for DNA and forensic testing is an abuse of discretion. When discovery is indispensable to a fair and rounded development of the material facts, and the material facts may establish prejudice, discovery must be approved. In this case, Judge Lodge allowed enough discovery to see to allow Mr. Smith to see what evidence is available for biological testing. And the best analogy that I can come up with to explain what it feels like in this situation is having a trained lifeguard with the tools to save someone that's drowning, someone's drowning, and someone is holding the lifeguard back and will not let the drowning person be saved. What biological evidence in particular do you want to argue about today? The hair evidence, the blood evidence, and other fluid evidence at the crime scene. At trial, it seemed to me that if you mean other fluid evidence, do you mean the sexual assault kit? The sexual assault kit. And there is mention in a memorandum in the DNA supporting affidavit of Dr. Hampikian of potential semen evidence. Okay. But there was evidence at the trial that there was no evidence of sexual assault, right? Correct. Okay. And the hair that was found, I think, under one of the victim's bodies, it was testimony at trial that it didn't belong to Jeff or to Lanny, correct? Correct. All right. And I think when you refer to blood or semen – forgive me, blood or tissue, I think you're talking about the gun, that there would have been blowback to the gun because the shots were fired at close range. Is that what you're referring to? Your Honor, that would be one component of it, but there was blood evidence on the bedding and other fluid evidence on the bedding as well as on clothing. The reason I'm trying to ask these questions is because I'm trying to understand your theory. And it strikes me that because the defense conceded at trial that the rifle was likely the rifle used to commit the murders, that the defense was really limited to arguing that somebody else pulled the trigger. Is that a fair summary? Or if not, please correct me. Your Honor, it's a fair summary of what the defense argued regarding the weapon, but it's Mr. Smith's position now that that was an ineffective position to take based on the poor investigation or lack of investigation that the defense did with the weapon. With regard to the biological evidence and other issues, there are – and there are hairs that were inside of two sets of shoes, and there is evidence that was submitted in support of the motion for discovery that comparisons of Lanny Smith's hair and Jeff Smith's hair, the known subjects, did not actually make it back to the lab for a comparison. And those were letters attached from the FBI in Idaho State. Richard Crivello. How does the defense theory work if the defense can't effectively challenge the ballistics testimony? At trial, they didn't. At trial, Fox testified the defense expert's view was they agreed with the State's expert, I believe, that the bullet likely came from – bullets? Likely came from Lanny's rifle. Is that right? That's correct. So if you assume the worst, that that is indeed the gun, the evidence does not place the gun in Lanny Smith's hands at the time of the murder. Right. And that's why – It's circumstantial. That's exactly right, Counsel. And that's why I'm trying to get at this, the biological evidence. It seems to me the defense theory had to be somebody else pulled the trigger. I would say that that's part of the defense theory, that someone else pulled the trigger, but that it was someone else that was actually there at the house and not Lanny Smith. Someone other than his brother? Someone – anyone other than Lanny Smith. Well, wasn't that essentially the defense that was presented at trial? The defense did focus on Lanny Smith's brother, because he had originally Which is someone other than Lanny Smith? Correct. Okay. Because he had actually been originally charged with the murder. Okay. So how was it that that defense wasn't fully presented, especially in light of all the evidence that was collected, and that if maybe the defense attorney made a strategic decision, if he had done more, it might have been not favorable to your client in terms of other forensic testing? I'm just trying to understand your theory today. Okay. Your Honor, I'm going to start with the second part of your question regarding strategic decision, because I think it's an important discussion. The defense did not make a strategic decision in this case not to conduct forensic and fluid testing. They did no investigation. Well, but why isn't that a strategic decision? If they had done, could there not have been something that was revealed that could have possibly implicated your client? Because this is an actual innocence case, my answer is that there would any testing done would at that house on fluid evidence would not implicate my client. Do I agree that there can be a strategic decision made about that? Yes, but not in this case, because that's not the record – that's not what the record supports the defense did. The record does not support that the defense made a strategic decision not to test the fluid or biological evidence. Why do you say that? On what basis? Based on the best explanation is a declaration – the Declaration of Cris Rose, which is attached in Volume 5 at tab 75. Cris Rose was a defense investigator. And in October of 1995, which was right before trial in May of 1996, he and the defense expert, Richard Fox, were in Idaho in the evidence room with the Detective Rodriguez discussing what evidence was in the room, what was available, and what had and had not been tested. And in that discussion, that transcript, it's very clear that it was unknown where four negatives were, that there's a report that says that those four negative picture shoes do not match either of the shoes at issue. There was a question about where the biological fluid and evidence even existed. And the discussion was not, let's not test it, but let's get it together and test it, and nothing was done. But how do we know that a decision wasn't eventually made strategically not to test it? You can't really say that. The record – I believe that the record supports that it was not a strategic decision through the deposition of Stephen Thompson. Okay. Let me ask you, because you also, I think, make a request regarding Detective Rodriguez's files, I think. Is that correct? Yes. And I want to make sure I understand that. It seems like a prisoner requesting discovery must show good cause. Do you agree? Yes. Okay. And demonstrate how the discovery sought would substantially – I think the exact term is substantiate your underlying claim. Now, other than the letter that Mr. Swager claims he wrote Detective Rodriguez in the hopes of making a deal, if I understand this correctly, a letter that even assuming it exists seems – we had questioned the materiality because Mr. Swager indicated that he initiated contact with the authorities hoping for a deal. What specifically do you think you'd find in Mr. Rodriguez's file, can you say? The record indicates from the time of trial that the State was, even during trial, disclosing evidence late and giving the defense discovery late. When Judge Lodge allowed me to pose Detective Rodriguez, what we learned was that he kept his own separate files apart from what was disclosed in – from what I understand was disclosed in the discovery of the State's files for discovery purposes back at trial and for discovery purposes here. There has been – Did you ever get Rodriguez's file? No, because Judge Lodge denied access. So I can't say for sure what's in those – in his files, but what's very troubling is that in this case there has been arguments regarding repeated Brady violations, which gives the argument that there may be discovery – information in Detective Victor Rodriguez's files that the defense has never seen. I mean, it seems like that's your – that's why you think something will be in Mr. Rodriguez's – Detective Rodriguez's files, but what in the other Brady violations would show that there's something in Mr. – in Detective Rodriguez's files? Detective Rodriguez was the – from the time that Lanny Smith was – What are the other Brady violations that you're alleging? Well, there's a Brady violation related to post-conviction that after Jamie Hill came forward, the investigator's office for the State did review – did interviews that were not disclosed, but those are not related to Detective Rodriguez. Those are not related to Detective – No, because Detective Rodriguez did not do those. So what Brady violations are related to Detective Rodriguez that you think that there would be something in Detective Rodriguez's files other than speculation? The Jamie Hill statement, for example, that she came forward earlier like she originally said. But the State court – didn't the State court make a – the last recent decision make a finding that that disclosure was after the critical time period of the trial? They did make that finding, but they made that finding without knowing that there was a subsequent Brady violation related to the evidence that they heard at that post-conviction hearing. What's the subsequent Brady violation? When Jamie Hill came forward in 2000, the same investigator who had been investigating Morgan Hendricks did – was interviewed by another investigator for the State. The post-conviction counsel did not have those interviews, and that is submitted in Rocky Wixom's affidavit at volume 5, tab 97, post-conviction counsel, that information that I found during the discovery phase of interviews was not accessible to post-conviction counsel. But wasn't there a reason it wasn't accessible to post-conviction counsel? I thought there was a stated reason for it. I can't remember exactly what it is right now. It was simply not handed over. Okay. Counsel, this is the same Detective Rodriguez who responded as the first investigator on the scene – at the scene of the murders, correct? Yes. All right. And this is the same Detective Rodriguez who was in charge of taking the photos of the footprint, right? Yes. Okay. And there's an outside footprint? Yes. And he found – Detective Rodriguez is the one who found the inside footprint in the upstairs bedroom, correct? I would say, Your Honor, that it's unclear whether Detective Rodriguez found that footprint or Morgan Hendricks found that footprint or Kim Marshall found that footprint. How long did it take to notice the footprint in the bedroom and the dust on the floor? Wasn't it a couple of hours after folks had been responding to this murder scene? Yes. I'm very concerned about the footprint, because it seems to me that the defense theory, the defense had to have recognized that they couldn't challenge – apparently came to the conclusion they couldn't challenge the ballistics. And this goes back to the fact that this was the gun, probably. I think the defense conceded that at trial. Lanny's gun was probably the gun used in the murder. So the defense really had to argue that somebody else pulled the trigger. And that's why the footprint seems to me to be so terribly important. So I'm concerned about what evidence there is about when that footprint was located and why there was – there were botched photographs of the footprint. Where would we find that evidence in the record? That evidence is in motions in Lemonnier regarding Eric Greenwade and trying to get Eric Greenwade excluded. That evidence is also discussed in the motion to dismiss the grand jury indictment, because the defense brought a motion that Detective Rodriguez had lied about his photograph of the footprint and when the remedy of the measurement was being addressed. And it is – it's – so it's with – it was discussed at trial. Obviously, the footprint was a huge issue. But anything else related to what Victor Rodriguez might have are in files that I haven't had access to. Okay. So let's back up just for a second, please. Greenwade is the individual who was called to testify because the photo wasn't taken at the correct angle and there hadn't been a ruler, is my understanding. I'm summarizing this. I'm probably not doing a very good job of it. But that's the expert who – the mathematician who was called for that purpose, correct? Yes. All right. And so I'm concerned about the testimony that I saw in the record to the effect that the negatives didn't match up. They couldn't find the correct negatives, which seems to me terribly important given that the photo was manipulated by Greenwade. I absolutely agree. It's troubling that the photograph was manipulated by someone who had absolutely no experience with forensic, and it's even more troubling that the defense knew that there were four negatives that didn't match, and they did not investigate the four negatives. But we're here on an ineffective assistance claim, and the defense argued hard. They fought hard to keep Greenwade's testimony out, and they weren't successful, right? Right. Okay. So please, if you could help me explore and understand the failure to get those negatives. I'm trying to circle back to Judge Merguia's question, because I think she and I have the same concern about a possible Brady violation and where those negatives are located, because it's a little bit unclear to me in the record about which negatives were missing. There's an outdoor footprint, and my understanding is those photos were sort of obliterated, and those were not introduced at trial. They didn't turn out because there's something wrong with the film, is that right? No. The outdoor footprint was actually turned into a cast. Oh, that's right. But something about it wasn't done correctly. Correct. There was questions about whether or not the casting was appropriate. And the other issue with regard to that footprint was that Jeff Smith had been outside that day. Right. Was the casting ever used at trial? It was. It was admitted into evidence. Did Rodriguez perform that, make the casting? It is not my understanding that he made the casting. I want to say it was either Kim Marshall or Morgan Hendricks. When Greenway testified, he testified about a nick in the shoe, the photograph, and I'm moving to the photograph of the indoor footprint. Was there any testimony at trial that there was a comparable nick or anomaly in the cast outside? I'm not sure. How many indoor photographs were taken of the footprint in the dust? Four negatives that I have never seen that are in the record. The roll of film that did not develop that was the footprint underneath the bed and then the inappropriate, the one that was taken at the wrong angle by the doorway. Did Shepardson testify at trial? She did. There's a comment in defense trial counsel's deposition testimony to the effect that he understood that Shepardson didn't agree with Greenway. Shepardson being the State's other witness, correct? Correct. All right. And that she didn't agree with Greenway. He makes that statement. What's the basis for the statement?  The basis for the statement would be the argument that Greenway was not a witness to the motion in limine to exclude Eric Greenway from his testimony to begin with because it was late in being disclosed, and it was so unique to have someone who was not related to visual impression evidence or forensic evidence in any way come in and be doing this, manipulate visual warping. Right. There was a real fight about that testimony. There was. But it came in. And during the course of that, basically a motion in limine or an evidentiary hearing, was Shepardson a witness? I do not believe that they called witnesses at that motion in limine. Okay. Then in that case, we're not communicating, because I'm trying to figure out the basis for defense counsel's understanding that Shepardson did not agree with Greenway or had some problem with Greenway. In other words, two of the State's experts on this very critical piece of evidence seem to have not agreed. And since we're here on ineffective assistance of counsel, it seems to me to be very critical to know why or how there could be a strategic decision not to cross-examine Shepardson on this point. My understanding of where he got that information was that Richard Fox had talked to Donna Shepardson, and that information came there. But I cannot pinpoint the exact information, the location of where defense counsel got that piece of information and knew what her position was. Did defense counsel cross-examine Shepardson on Greenway's testimony? I do not know. All right. I just have one more question, because my colleagues do get to ask questions as well, and I don't mean to be monopolizing your argument. But the other thing I just want to be really clear about is that these two brothers had, as I understand, the same type of shoe, but that Jeff testified at the grand jury that he could wear either an 8-1⁄2 or a 9-1⁄2, is that right? That is true. Thank you. I'm over time. Kennedy, did you first learn about Rodriguez's private file? I learned — there's two places where there's mention of it. At post-conviction, the trial counsel, instead of filing a motion for discovery, he filed a motion for a subpoena ducis tecum, and in his motion for subpoena ducis tecum, he quoted any and all files kept by Victor Rodriguez. So it was that subpoena that caused me to ask him questions about that when I deposed him, about what files he did or did not keep. You're speaking of Rodriguez now? Yes, Victor Rodriguez. So you didn't discover Rodriguez's personal file until after this trial was — after the conviction, of course. Correct. At the habeas stage of discovery. And the question asked for discovery on the file. Correct. I filed a second motion for discovery, and it's with the biological evidence, and it also includes Detective Rodriguez's own files that he kept and the deposition of James Swager, the recanting snitch. Did the prosecutor on that case, on this case, know that Rodriguez had his personal files? I do not know if he knew that information or not. I would assume that he did not because the judge has ordered — had ordered access to files that were in possession of the State. And when I was given those file — access to those files at Federal Habeas, any separate files kept for Detective Rodriguez were not a part of that. And you don't have them now? I do not have them now because Judge Lodge denied the discovery motion. Well, Rodriguez's file was in a file kept by the State, I would think. I agree, but what Detective Rodriguez testified to was that those files were probably in the evidence at his deposition, that those were probably in the evidence room at Bonneville County Sheriff's Department, and if they weren't there, he didn't know where they were. Why does it matter if they were in the evidence locker? I read that in the file, too. I don't — so what? Well, I haven't been allowed access to the evidence locker. But the judge ordered them produced, right? He ordered all of the files produced, and the State produced what the State was — was given from the prosecutor's office from below, from what I understand. But the separate files, if they exist based on what Detective Rodriguez said in deposition, were not in that same location. Can you offer a way of explanation of how they could have been perhaps overlooked when someone went back to gather these files together? Yes, because my assumption was that they were kept in the — the files that the State produced were kept with the prosecutor's office, and Detective Rodriguez is talking about a separate set of files. Well, it's not uncommon for detectives to keep separate private files. In my experience. Unless they're specifically called for, they're kept there. And there are times when the files are produced, that there's exculpatory material in those files that should have been disclosed on a Brady motion. I agree that they should have been disclosed. But none of those files are his personal files. They all belong to the State. I agree. Was there anything in the record where the prosecutor or any State official indicated that there had been — that Rodriguez had been asked if he'd kept private files? I cannot point to any evidence in the record to that other than what Victor Rodriguez testified to and the things like the Jamie Hill matter that have come forward that had — that came forward after the fact. What reason did the district judge give for denying access to Rodriguez's files? Judge Lodge's order was essentially that while he had originally agreed to allow the defense to conduct limited discovery that was narrowly tailored, his position was that the discovery that I was asking for as a follow-up to what I found after I looked at discovery was taking it too broad. Was too broad? Too broad, and that it was beyond what he had originally approved. Beyond what? Beyond what his original order was. What was his original order? His original order was to give me — was that I was to have access to the State's files, and I don't — I'm not quoting his exact language, but paraphrasing the State discovery, the State's files. Thank you. Well, what about that? You looked at Rodriguez's files? I'm sorry, Judge Peterson, I didn't hear you. Have you had access to Rodriguez's personal files? No, Your Honor. We have not had access. In fact, we don't know that they exist. The only information that we have regarding Detective Rodriguez's files are from his deposition where he seemed to indicate that — and I don't even know if it was in this case specifically, but generally — he had a, quote, unquote, private file or a separate file that he kept that he generally provided copies of everything in that file to the prosecutor. The problem that we have in this case is that Detective Rodriguez, to the extent he actually had a separate file in this case, said he didn't know where it was if it wasn't in the evidence locker. Counsel has had complete access to all of the evidence that was in the evidence locker, did not locate any separate file. And so the status of the record at this point is either it doesn't exist, didn't exist, or it's unknown where it pleasantly exists. Or someone didn't look too hard to find it. That's — What have you done to see whether that file actually existed? Well, we certainly took Detective Rodriguez's deposition. And as I said, me personally, I haven't done anything other than the deposition, because Detective Rodriguez is the individual that knows about the file. He's the one that would know whether it exists, whether it — where it is, and what it contains. Is it common for detectives to keep their own separate personal files on cases? Oh, I don't know that it's particularly uncommon. It would be uncommon not to disclose everything in that file to the State during the discovery process. That would be unusual. But certainly detectives keep files that — that I don't really like the word personal, but that are personal. Sometimes they keep files. Certainly. And they have stuff in them that they don't want the defense counsel to see, because it's exculpatory material. But, Judge Pregerson, I don't believe that's common. It happens on occasion, yes. It happens. It happens. And this is a very serious murder case. There's no question about that, Your Honor. The problem — So Rodriguez's file, and I'm assuming you had one, just disappeared. Well, this murder occurred in the mid-'90s. It's not uncommon for evidence to — and I'll characterize it as evidence for purposes of this argument — for evidence to disappear years after the fact. That's one of the reasons that we have such a high standard in Federal habeas for granting relief under the AEDPA, or for that matter, de novo review, as in the case of the certified issue before this Court. Or for that matter, even discovery. The high standard. The high standard for discovery, the AEDPA, or de novo review, Your Honor. I mean, to grant review in Federal habeas, it's a very high standard. We're aware of that, counsel. One of the reasons that I'm particularly concerned — Excuse me. I don't understand what you mean by a very high standard. What I'm saying, Judge Pregerson, is that the Petitioner has a high standard to meet to be granted habeas review, and one of the reasons for that standard is because of all of the things that have taken place in State court, the presumptions that are present in State court, and, quite candidly and frankly, because of the time that passes between the commission of the crime and before you get to Federal habeas. Years pass in these cases. Well, you know, the time is consumed a lot of it by the State process as well. So these things all take time. Certainly, Your Honor. But it troubles me to — that Rodriguez had his own separate file and it's gone. I mean, he's a professional, isn't he? Yes, Your Honor, I would assume so. They do their files, they just don't sprout wings and fly away. But evidence does, after years, tend to disappear, years after the fact. How long has it been? Murders, as I recall, occurred in 1995, Your Honor. That's 18 years? That's a significant period of time, Your Honor. Not when you get to be 90. So, yes, a significant period of time when you're 20. But, you know, things take a long time. These cases drag on and on. That's part of our system. And, anyway, I'm troubled by that. So we don't know if they existed. If they existed, you don't know where they are, because they would have been in the evidence locker. I've been hearing about an evidence locker. Is that correct? Or where you — the evidence room? Where the evidence is stored, Your Honor. Okay. And someone has looked where that is, that location, and has given the defense everything related to that. Counsel had complete access to everything that was in the — Oh, because she says she didn't. Because right now she said, I've never been able to see the evidence locker, or whatever it was. She was granted access to everything pursuant to Judge Lodge's first order. My understanding, based upon the information, and it's obviously not contained in the record, but my information from the individuals at the Bonneville County Sheriff's Department was that counsel had complete, unfettered access to everything that they had available. Well, because that's what the judge ordered. And that's what's troubling counsel. Because she said she didn't get it. And that's — that's, I think, the whole gist of Judge Pragerson's questions. I would like to take you back to an earlier comment you made about the — What was the answer to my question? That she didn't have access to the files, but the court ordered access. Well — That's what we're trying to figure out. And — and — and the question I have, counsel, really goes to — I mean, I think it was a presumption that the State maintains its records in an orderly manner, too. Right. And so — so the question I have, counsel, really goes to your comment that you don't know whether the file ever existed. Because it seems to me that there's some pretty strong circumstantial evidence that it did. Isn't there? There is some evidence that it did. Because of the passage of time, Detective Rodriguez was fairly ambiguous about whether it actually existed in this case or not. It was his practice to keep a separate file. He testified to that. It was. And there's correspondence that should have existed between Rodriguez and Swager that's not in the State's files, right? We know that. That is true, Your Honor. That is true. There's a pretty strong suggestion that the file existed somewhere, and then the question becomes whether it still exists. Hence Judge Pregerson's question, did somebody really look? That's where he's — I think that's where we're all coming from. My understanding is that it was investigated. Did I personally go over to Bonneville County? No. And I want to be clear. I don't think anybody's suggesting that there's any, you know, wrongdoing here. It's a lot of time. I fully appreciate that. And I'm sure the State shares our interest in making sure that the trial — that the judge's order was followed, and making sure that this discovery was produced. So please don't ask me to be casting any kind of aspersions. But the record seems to me to be suggesting strongly that Mr. Rodriguez kept a separate file and that it hasn't been produced. Hence my questions. Thank you for your patience with me. But it's not uncommon for States to withhold Brady material. Well, Judge Pregerson, I'm not going to agree with that. All you've got to do is read our cases. No. I understand that it happens, but I'm not. We have lots of cases where Brady is disrespected and the ball is hidden and this goes on and on. And I certainly understand that, Judge Pregerson. But part of the problem with Smith's second discovery request, and I believe the question was asked, why was it denied, not only — really the issue in this case is — the certified issue is the retention of Dr. Fox. And the discovery material that they requested have nothing to do with the deficient — alleged deficient performance of counsel in retaining Dr. Fox. That's the crux of the question. All of the discovery that they requested goes to the issue of prejudice. And Judge Lodge never made a finding on prejudice. He said there was not deficient performance because Mr. Fox, Dr. Fox, they made a strategic decision to retain Dr. Fox for all purposes. And the question becomes, was that decision an unreasonable decision by trial counsel? And it certainly was not based upon the record that we have in this case. There's nothing that prevents a trial attorney from hiring an expert who is a — and I'll use the words — jack of all trades, that can do the forensics in the area of hair, fluids, footprint, ballistics, everything. The whole nine yards. Was there a limit on the amount of money that the defense counsel could spend on experts? There were some limits put in place, Judge Pregerson. But counsel — trial counsel came back at least once, and I believe twice, and asked for more money. If you look at the record that — of Dr. — How much money was allocated? I can't give you exact amounts, Your Honor. But Dr. Fox explained that he was in constant contact with defense counsel. Thompson, who was Smith's primary attorney, testified — this is the excerpt of the record, page 44, page 64. We had everything physically examined by Mr. Fox. Now, when he said everything, I assume he meant everything, including the hair, including the sex crimes kit, the fluids, everything was examined. There was some equivocation on the part of Thompson about testing and the sex crimes kit later on in his deposition. But the question has to be asked, why wasn't there a request by Smith to propose Fox instead of just counsel? And that request has never been made. If you look at the transcript of the meeting — and I'm sorry I don't have the exact page on the — from the excerpts, but there was the meeting between Dr. Fox, Detective Rodriguez, and there were some other individuals there. I believe Mr. Thompson might have been there. They discuss all of this other evidence. Now, there was some concern that something might have been missing at that meeting, but there's no indication that it wasn't found later and provided. The trial transcript reveals that Fox did the following. He did laboratory work on the shoes. He examined the firearms and casing. He looked at the pants and the paint spot on the pants. If you look at the affidavit of the prosecutor, this is the supplemental excerpts of Record 2851, Fox was given the rifle, the shell casings, the lead slugs, the fragments, the footprints and the footprint information and material they had, and other physical evidence. Dr. Fox was given everything, and a tactical decision was made to retain that individual. How could it have been tactical to not cross-examine Shepardson about the fact that Thompson understood Shepardson disagreed with Greenway on this very unique manipulation of the footprint photo? I'm not sure that's what the disagreement was, Your Honor. And the problem is the record isn't real clear in that area. My understanding with Shepardson's disagreement with Greenway was the anomalies that Greenway found. And what's important in that particular aspect. Those anomalies were pretty critical, right? With all due respect, no, Your Honor. Jeff and Lanny both could both wear that shoe. One wears the 9-1-1, one wears the 8-1-1, yes. Well, one of them testified that he could wear either one, right? And the defense had to be that somebody else pulled the trigger. They conceded at trial this was the rifle. The ballistics evidence matched up. Fox agreed with that, right? Had to be. That was their theory. But it seems so critical to me, and I can't imagine a strategic reason for failing to cross-examine that witness. My question is, I'm not trying to be flip, I'm asking. I understand that. Think of one. I think that they were waiting for Greenway to testify. Greenway testified first. Am I wrong on that? I thought that Shepardson testified first. And the reason I say that is because there was such a fight regarding Greenway. In fact, at the end of the very long void dire that took place with defense counsel and Greenway during the direct examination, the trial judge said, I don't consider you an expert. This is to Greenway. I don't consider you an expert as a criminalist, nor do I consider you an expert in footwear identification. Now, that's pretty critical because it reminds me of the show with Tom Cruise and I can't remember where, anyway, it doesn't matter. You just had a judge say, you're not an expert in footwear identification. For all intents and purposes, Greenway's testimony just went out the window, except for the manipulation of the photograph. And this case came down to Donna Shepardson and came down to, well, to Mr. Fox, who for all intents and purposes agreed with Donna Shepardson in that the eight-and-a-half foot joy could not be eliminated, but the nine-and-a-half could. Well, Greenway's testimony didn't just go into the mathematical sort of manipulation of the photograph, right? He was allowed to testify about a particular anomaly in the tread. There's no question about that, Your Honor. And when you consider the judge's ruling on whether he's an expert in that area, I candidly admit that that – I can't explain that. But that's not an ineffective assistance of counsel claim. I appreciate your candor. But let's assume that I'm – let's just assume as a hypothetical that Greenway had testified first at trial. If that's the case and then Shepardson took the stand, I'm not sure you answered my question. Can you think of a reason for not cross-examining Shepardson regarding the extent to which he disagreed with Greenway? If, in fact, Greenway testified first, and I do have his testimony at the desk, I can only assume that counsel considered this ruling by the trial judge that said you're not an expert, Mr. Greenway, in footprint identification and saw no reason to exploit Dr. – or Mr. Greenway, he's not a doctor, Mr. Greenway's testimony further. That's really the only explanation I can give you. I just had a quick question. I think the petitioner here is arguing that the district court applied the wrong standard in dismissing some of his claims summarily. What's your response to that argument? Your Honor, the only claim that I'm really prepared to address today is the ineffective assistance of counsel stemming from the forensic evidence. Those claims that were dismissed prior to that are not before this Court because there hasn't been a certificate of appealability issued with regard to those specific claims. And, in fact, the discovery that they have – that they requested has to be tied in, based upon the certificate of appealability, with that specific issue. And that's why I find it, quite frankly, perplexing that we're talking about discovery, because the discovery that they requested was modern-era DNA, not DNA that was available in 1995. Well, we also just got – requested Rodriguez's file. And – and I apologize. And I did the same thing a minute ago. That is true. And the judge ordered it produced. Yes. And I think I've addressed that the very best I can. Let me ask you a question. Yes. Who paid defense counsel? Trial counsel? Yes. Honestly, Your Honor, I don't know if he – I know that the State paid for all of the experts that they requested. I don't recall if he was – he had to have been appointed as a public defender. He had to be appointed. He had to have been. Yes, he was. I remember now. Yes, he was, because he was appointed, as I recall, five days after – two days after Lanny was arraigned. And was he a public defender? Yes, Your Honor. Both of them, Mr. Wolf and Mr. Thompson, were they – were two of the, quite frankly, more premier public defenders, particularly at that time. Mr. Wolf has since passed away, and Mr. Thompson continues to practice criminal law. But to get money for experts, they had to get permission from the judge for them. That is true, Your Honor. I'm certain of that. Yes, Your Honor. And because it was only a matter of like five days after they filed their notices of appearance that they filed just a plethora of motions for experts, including ballistics, footprint. I believe the psychologist was requested. There were like four experts requested at that time, and they were all granted. The public defender was really not an independent entity. If they have to go to the judge to get money. Oh, I respectfully disagree, Your Honor. Why? Because there's no real – He's got an independent public defender. They have their own budget for – for to get out detectives, you know, to get higher experts and all that. That doesn't make them non-independent. They were given – I don't recall in the record a single solitary request for expert assistance that was denied by the trial court. When they came back and asked for more money for Dr. Fox, it was granted. They were given everything that they requested. Counsel, maybe you could help me out on this point. The defense argued and objected, I think pretty strongly, about the introduction of Greenway's testimony, Mr. Greenway's testimony. And one of their objections is that he was disclosed late. They got overruled on that. I understand that. But at that point, then they had an expert who was a mathematician doing this very unique analysis of the footprint photo. Did they ask for an opportunity to get their own expert to counter that witness? My recollection is that they did not request another expert. But Dr. Fox testified that – that he had consulted with some other individuals that were experts in this particular area. And quite frankly, they didn't have a problem with the manipulations – I'm not sure that's the word I should use – but the things that Dr. – excuse me, Mr. Greenway did as far as enhancing the distortion from the photograph. Their problem was with his finding of the anomalies, which arguably, based upon the trial judge's ruling, he wasn't qualified to make. To make, right. And again, I appreciate your candor on that point. But your recollection is that they did not request, in conjunction with objecting to the introduction of Mr. Greenway's testimony, your understanding is that they did not request an opportunity to do any other discovery or hire any different expert. They did not request another expert. I know that Dr. – there was Dr. Fox contacted Mr. Greenway, met with Mr. Greenway in person, and did contact these other individuals. Their problem, their beef, if you will, was not with, again, the manipulation. It was simply with the findings of the anomalies. And in fact, it was because of Dr. Greenway's upcoming testimony that – excuse me – it was because of Dr. Fox's work in the area of the shoe print identification that actually caused the State to go out and retain Dr. Greenway later on. Right. Because he – because Fox was able to say this photo was taken at the wrong angle. Yes. That was the problem. Had Fox ever – was there any indication that Fox had ever worked on a case before involving this kind of manipulated photo? There's nothing in the record establishing that, Your Honor, no. Thank you. I couldn't find it, but if you knew, I wanted to know. Thank you. I'm certain it's not in there. I just want to ask you a couple of questions. Yes. When did the State, or the county in this case, perhaps, establish an independent public defender organization? See, I ask you this because I'm interested in the subject. I had something to do with setting up the Federal public defender system in Idaho. You may not know that. It's been 30 years, so that's – you were a baby then, right? That's where I'm from. So, and I sat as a district judge in Boise when the Ruby Ridge trials were taking place, and I had a pretty good-sized calendar that came to help out Judge Lodge. And in those days, did the judges appoint defense counsel? Your Honor, I mean, you know, that was common. It was, and it's – They had a list. And different lawyers in the neighborhoods and all that. Recent law school graduates who were looking for experience and whatever it was, they had a list, and judges would make the appointments. And limit the amount of money that could be spent. So, was that how it worked here, or was there an established, independent State or local public defender system? Your Honor, I'm somewhat familiar with the Federal public defender system in Idaho. And what I can tell you is that at that time, in 1995, it's my understanding that the public defender system that existed in Bonneville County did not exist in that particular fashion. Now, I will tell you that I'm not particularly familiar with exactly how it was set up in 1995. Different counties have different systems in Idaho of appointing counsel. For example, in Ada County, which is the capital county, there is a, using your words, an independent public defender that has an entirely separate budget that when things get – they have a lot of murder cases, they have to go and get additional funding from the county commissioners. They don't generally go to the judge. In other counties, they have to go to the judge, even today, for everything. But when it comes to the facts of this case, they were given everything that they requested. And Stephen Thompson and Mr. Wolf, as I said, were two of the premier public defenders, two of the premier defense attorneys in the Idaho Falls area at the time of this murder. And they consulted two of the premier defense attorneys in the entire state. David Nevin, who you mentioned, Ruby Ridge, I believe was involved in some fashion in Ruby Ridge. And there was another individual that was consulted also. Premier defense attorneys. This is not a case where they had their hands tied by any stretch of the imagination by a limitation on funds. No, I'm, you know, I'm just trying to find out. Sure. Sometimes what goes on in the real world. And I appreciate that, Judge Pregerson. If there are no other questions, the State would ask that the district judge be affirmed. Or alternatively, should this Court find that there was ineffective assistance of counsel, both deficient performance and prejudice, that the case be remanded for a determination of whether this claim is even timely, which was not addressed by Judge Lodge. Thank you. Thank you. I did use all of my time. So unless there's no further questions, I would ask that there be, as I heard Judge Pregerson mention yesterday, that one or two out of a thousand cases are granted habeas relief. This is that one case. And I ask that you grant this habeas petition and at a bare minimum remand so that the evidence can be reviewed and tested. Thank you. All right. This matter is submitted.
judges: Pregerson, Murguia, Christen